# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| LUCILLE YVETTE ARRINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:16-cv-01355-JEO |
| ) | |
| ALABAMA POWER COMPANY and ) | |
| its parent company SOUTHERN ) | |
| COMPANY, ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Lucille Yvette Arrington, acting *pro se*, initially sued Alabama

Power Company and The Southern Company (collectively, the "Defendants") for

alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

*et seq.* ("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et*

*seq.* ("ADA"). (Doc. 1). The Defendants filed a motion to dismiss her complaint

for failure to state a claim upon which relief can be granted. (Doc. 14). The Court

granted their motion, but Arrington was permitted to file an amended complaint.

In her amended complaint, she advances the two previous claims and adds a third

claim entitled "Work Place Hazard." (Doc. 31 at 18-19). Defendant Alabama

Power Company has again filed a motion to dismiss the amended complaint for

failure to state a claim. (Doc. 33). Arrington opposes the motion. (Doc. 35). For

the reasons that follow, the Court will grant the Defendant's motion to dismiss.

## STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a motion to dismiss an action on the ground that the allegations in the complaint fail to state a claim upon which relief can be granted. On such a motion, the "'issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Little v. City of North Miami*, 805 F.2d 962, 965 (11th Cir. 1986) (quoting *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974)). In considering a motion to dismiss, the court assumes the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences. *Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam).

Rule 12(b)(6) is read in light of Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, brackets, and

internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* Thus, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *i.e.*, its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557).

## ARRINGTON'S CLAIMS

Arrington is a former employee of Alabama Power. In her "Introduction" to the amended complaint, Arrington explains that she filed her case of discrimination and retaliation after her initial transfer "to a position in a location with a history of racial bias." (Doc. 31 at 2). She also states that she "applied for more than 8 positions internally and numerous positions externally and was unsuccessful at every attempt for over 2 years." (*Id.*)

Arrington's allegations remain confusing and hard to follow. She alleges that the retaliation began in October 2013 when she was employed as a Supervisor in Alabama Power's Metro Central Business office and reported to her supervisor, Scott Cotney, that another employee possessed pornographic materials in the

workplace that made other African-American employees uncomfortable. According to Arrington, the offending employee was "closely connected" to Cotney. (*Id*.)

A.    **Transfer to the Columbiana Office**

Cotney informed Arrington in November 2013 that she was being given a promotion and a transfer to an Alabama Power office in Columbiana, Alabama. When Arrington asked if the move was retaliatory, Cotney explained that the promotion was in light of her good performance and that it would allow her to be a Manager in charge of an office. (*Id*. at 2-3). Cotney allegedly told her, "Don't you go there and ruin it." (*Id*. 3).

At the Columbiana office, Arrington was in charge of older white females. Arrington claims these employees were insubordinate, with one particular employee reporting Arrington to Cotney in January 2014, and yelling at her in front of customers and talking about her behind her back in February 2014. (*Id*. 3-4).   Arrington told her supervisors that she felt "violated" by the foregoing conduct but had to "maintain professionalism and a team spirit." (*Id*. at 4).   In March, when Arrington's white supervisors were questioning her, they told her she needed to "start sewing and knitting with them (the other employees)" and stated that she (Arrington) responded the way would have in the circumstances. (*Id*.)

About this same time, Arrington learned from Tim Bowen that some of her duties were being changed and she would no longer be involved in community outreach. (*Id*.) She stated this was done despite the fact that other white supervisors had been out in the community for the last twenty years. (*Id*.) Arrington also noted that she received accolades when she spoke at a Kiwanis Club luncheon during that time. (*Id*. at 5).

## B.   Arrington's Mother's Illness

On May 27, 2014, Arrington informed her supervisors and employees that her mother was being hospitalized, and that she would be working on reports from the hospital. (*Id*.) On May 28-29, 2014, Arrington notified her supervisors that she would not be in for work because her mother's condition was worsening. (*Id*.) Her mother passed away on May 30, 2014. Around June 2, 2014, her supervisors delivered a large tray of chicken for her family.[1] (*Id*.) Arrington's "white supervisor" emailed her on June 5, 2014, asking about the reports she said she would work on. (*Id*.) Arrington stated that she did not complete the reports because she did not anticipate her mother's condition worsening. Arrington claims that her supervisors did not attend her mother's funeral despite a "long standing tradition" of supervisors attending the funerals of the immediate family members of those who report to them. (*Id*.) On June 7, 2014, Arrington's father almost died

---

[1] In her response brief, Arrington argues that the chicken was related to "a well-known racial epithet"; however, she does not allege that this action was racist in her complaint. (*Id*.; Doc. 35 at 8).

at her mother's funeral and was hospitalized. As a result of this, Arrington did not return to work until June 16, 2014. (*Id.*)

On June 17, 2014, Arrington's supervisors told her that they understood her situation, but that "business must go on" in reference to the reports she did not complete. (*Id.*) It is unclear from the amended complaint, but Arrington seems to allege that she was not allowed to follow a company policy concerning checking cash trays until the white female "assigned" was present. (*Id.* at 6). Arrington allegedly followed correct procedure and complained to the Division Vice President because she did not feel her immediate supervisor could solve the issue. She was told to discuss the issue with Ashley Robinett, the area manager, first. (*Id.*) Arrington told Robinett "she felt there was a racial bias towards her and there was an attempt to make [her] look like an under performer." (*Id.*) Robinett denied that there was anything to do with race. (*Id.*) Sometime later, Arrington was kept out of a meeting in Columbiana between Robinett and the remaining all white staff. (*Id.*)

In June 2014, Arrington also delivered four reviews to her white employees and gave two of the employees a "Needs Improvement" rating. On June 30, 2014, Tim Bowen refused to give Arrington a recommendation for another job because he had "not seen anything good" from her in Columbiana. (Doc. 31 at 7).

Arrington was "required" to attend the funeral of a white female employee's father in July 2014 despite the emotional despair of it being close to her mother's death, and Arrington claims the white employee was given over 30 days off and that white supervisors and managers ensured others worked on the employee's reports while she was gone. Arrington does not say in the complaint whether she opposed going to the funeral, or if Alabama Power threatened to punish her for failing to attend. (*Id*. at 7).

In August 2014, Arrington was given a rating of "Needs Improvement," which Alabama Power defines as "[i]nconsistently achieves expected performance level," despite there being "no documented support." (*Id*. at 7). Bowen told her that "performance ratings are subjective." (*Id*.)

### C. "Work Place Hazard"

In January 2014, Arrington reported headaches, nausea, and shortness of breath and required medical attention. (*Id*. at 3). She went to see her doctor about every four to six weeks. (*Id*.) In August 2014, the Vice President of one of the divisions stopped by the office and stated that it smelled like mildew and needed to be checked. (*Id*. at 7). Arrington responded that she had been reporting it since February and the only change was a new air filter and the use of deodorizer. (*Id*.) Building Maintenance worked on the ducts on September 1, 2014. (*Id*.)

On September 2, 2014, Arrington walked into the building and had to leave after "30 or so" minutes to seek medical attention because she was having trouble breathing. (*Id*.) When Arrington requested the air quality test findings from Terri Tucker, another supervisor, Tucker responded that there were no air issues in the office.[2] (*Id*. at 8.) On September 9, 2014, Arrington met with Disability Management. (*Id*.) Someone in Disability Management confirmed that the building was positive for toxic mold spores and that Arrington's office had the highest concentration of spores. (*Id*.) Disability Management confirmed for Arrington that the illness was due to Arrington's job and gave her a job injury report to complete. (*Id*.) Penny Nichols, an employee in Disability Management, told Arrington that "only people with compromised immune systems have a severe reaction to mold" and "you don't sound like you need to be at work for your health and the sake of others if you are contagious." (*Id*.) Arrington did not return to work until September 29, 2014. (*Id*.) At some point in September, Arrington filed a "Workers Compensation Claim." (*Id*.) Arrington subsequently had her doctor fax paperwork to Disability Management stating she could not engage in activities that would adversely affect her breathing.

---

[2] Tucker claimed to have received the report from Alabama Power's Environmental Specialist. However, the specialist later stated he never received a request for the results from Tucker. (*Id*. at 10; Doc. 35 at 15).

On September 28, 2014, Arrington reported to the Pelham Business Office and Tucker advised her that Disability Management cleared her to return to Columbiana. (*Id*. at 9). Arrington immediately became ill after arriving at the Columbiana office and required immediate medical attention. (*Id*.)

In October 2014, Tim Bowen advised Arrington that she would be working in Pelham until work in Columbiana was completed in January 2015, and that she did not need to tell her team she was not returning. (*Id*. at 10). Another employee in Columbiana told Arrington that Bowen met with the office to announce that Arrington would not be returning to the office and all requests should be sent to Tucker. (*Id*.) Arrington asked Bowen about these statements and asked if she was being punished. Bowen responded that the situation gave them the opportunity to work closer together and gave Arrington the chance to take on some of Tucker's responsibilities. (*Id*.) Bowen said he hoped she did not see working with him as a punishment. (*Id*.)

In November 2014, Arrington's Workman's Compensation claim was denied.

### D. Transfers, Leave of Absence, and "Constructive Discharge"

On December 9, 2014, Ashley Robinett, an area manager, called Arrington in for a meeting and informed Arrington that she would move into Tucker's office, put in hours to "make sure things get done on time," could not volunteer for events

she had volunteered for the past four years, would keep her supervisor title, would not receive a pay increase, and that she was moved to Pelham "because of her performance." (*Id*. at 11).   Arrington argued to Robinett that she never had performance issues. (*Id*.)  Arrington then replied to an email from Robinett stating that she agreed with the content of the meeting "in order to preserve her job," and that her "white Supervisors" would look for any and all mistakes she made performing her "new responsibilities" while giving no recognition for things she did well.  (*Id*. at 12).

Arrington states she did not receive an invitation to the office Christmas party sent to "all employees" on December 12, 2014, and reported harassment, discrimination, and retaliation to the Employee Concerns line on December 14, 2014.  (*Id*. at 12).  On December 15, 2014, Arrington received a forwarded email inviting her to the party.  (*Id*.)  On December 16, 2014, Robinett rescinded the offer she made on December 9, 2014, and stated she would be reaching out to find Arrington a new position within the company.  (*Id*.)

On January 6, 2015, after seeing her physician and submitting new FMLA paperwork,[3] Arrington was advised she was being removed from her supervisor position and being placed in an individual contributor role reporting to Cotney and had twelve months to find a new position within the company or she would be

_____

[3]Arrington asserts in her response to the motion to dismiss that the Defendant did not accept her FMLA papers submitted by her doctor.  (Doc. 35 at 11).

demoted to a Sr. Customer Service Representative.  (*Id*. at 13).  As a result of the changes, Arrington had a new commute time of one to one and one-half hours.  She claims these "adverse actions" made it difficult for her to have a successful career.  (*Id*.)

On January 9, 2015, Arrington received a "Needs Improvement" performance rating and a bonus reduction of $2,934.75 despite accomplishing 90% of the measurements and achieving "accolades and accomplishments" in 2014.  (*Id*.)  Cotney informed Arrington that she would be responsible for finding her own work.  (*Id*.)  On January 12, 2015, Arrington filed an "Employee Concern" form.  (*Id*.)  Cotney asked Arrington if she filed a concern, and Arrington affirmed that she did.  (*Id*. at 13-14).  According to Arrington, the investigation following the filing of the "Employee Concern" only revealed "personal setbacks."  (*Id*. at 14).

Arrington claims she was blocked from new job opportunities for the next ten months.  Her EEOC charge asserts she applied for seven positions, but that the positions were awarded to "a Black Male, a Black Female, and a White Female."  (*Id*. at 14; Doc. 1-1 at 18).

Sometime around January 20, 2016, Arrington's physician stated her asthma attacks were triggered by stress, and Arrington requested a Personal Leave of Absence.  (*Id*. at 15-16).  Cotney responded by saying she could not take a personal leave because she already was out on FMLA.  (*Id*. at 16).  Cotney referred

Arrington to Disability Management, and a representative asked her whether she had any "Mental Issues." (*Id*.)  Arrington responded that she did not even thought she used the Employee Assistance Plan to receive grief and stress related counseling in February 2015. (*Id*.)  The representative and Cotney tried to convince Arrington to file for medical leave instead of a personal leave and supposedly questioned her doctor's excuse and FMLA paperwork "as if it were not legitimate."  (*Id*.)  Arrington asserts that the stress incurred over this two-and-a-half year period made her working conditions so intolerable that she felt "constructively forced" to resign.  (*Id*.)

## E.    EEOC Proceedings

Prior to bringing this action, Arrington filed two Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").[4]  She filed her first EEOC charge on January 19, 2016.  (Doc. 1-1 at 17).  She checked the box for discrimination based on "retaliation" and stated that she believed she was being demoted "in retaliation for complaining of a hostile work environment and because [she] reported toxic mold." (*Id.* at 17-18).  Arrington filed her second EEOC charge on February 1, 2016.  (*Id.* at 15).  She checked the boxes for discrimination based on "retaliation" and "disability" and alleged that she had been "subjected to

---

[4] The two EEOC charges are attached to Arrington's complaint. (*See* Doc. 1-1 at 15 & 17-18). Arrington makes note of the fact that the EEOC process began on August 13, 2015, and not January 2016.  (*See* Doc. 35 at 3).  This difference does not impact the Court's determination of the Defendant's motion to dismiss.

discrimination and retaliation in violation of the [ADA]" and had been "subjected

to discrimination because of [her] race (Black) in violation of Title VII …." (*Id.*)

## ANALYSIS

### A.     The Complaint Does Not State a Claim Under Title VII or the ADA

In its motion to dismiss, Alabama Power argues that Arrington has failed to

state facts that would support a claim under Title VII or the ADA.  (Doc. 33 at 4-

5).  Each claim will be addressed below.

#### 1.     Title VII

Title VII prohibits employment discrimination against any individual with

respect to his or her "compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national

origin."  42 U.S.C. § 2000e-2(a)(1).  To establish race discrimination, a plaintiff

must establish that (1) she is in a protected class; (2) she suffered an adverse

employment action; and (3) she was replaced by someone outside the protected

class or that others similarly situated outside the protected status were treated

differently than she was.  *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181,

1185 (11th Cir. 1984).  Title VII also prohibits retaliation against an employee who

has "opposed any practice made an unlawful employment practice" by Title VII

(the "opposition clause") or has "made a charge, testified, assisted, or participated

in any manner in an investigation, proceeding, or hearing" under Title VII (the

"participation clause"). 42 U.S.C. § 2000e-3(a). To establish a retaliation claim under Title VII, "a plaintiff must prove that [she] engage[d] in [a] statutorily protected activity, [she] suffered a materially adverse action, and there was some causal relation between the two events." *Burlington v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

Arrington includes a long and detailed list of factual allegations in the amended complaint. However, she fails to weave them into a coherent Title VII claim. Instead, she makes conclusory assertions. For instance, she states she was "retaliated against for reporting policy violations of a white male associated with her white male decision maker;" she was "discriminated against based on her race and transferred to a hostile and harassing work environment;" and she was "harassed and blocked from positions." (Doc. 31 at 17, 19-20).

Arrington's claim begins with the fact that she reported violations of the Defendant's sexually explicit materials policy involving a white male employee who was somehow connected to Cotney – her white supervisor. (Doc. 31 at 2). Arrington then seems to assert that Cotney retaliated against her by promoting her to a higher position within the company located in Columbiana – a location with a history of racial tension – where she would be supervising older white women. (*Id*. at 2-3). Although Arrington alleges that at least one of her white subordinates at this new location harassed her after she arrived there, the fact is that Arrington

was promoted to a higher position. She did not suffer a materially adverse employment action. Additionally, after the events, her supervisors asked if she wanted them to get involved in the situation, and Arrington declined the offer and insisted she had to be a leader. (*Id*. at 4).

Even assuming her initial action was protected activity and that there was causal relation between her report and her subsequent promotion or transfer, Arrington's placement in a position where she would be "totally responsible for all aspects of the office" does not qualify as a materially adverse employment action for purposes of Title VII. Thus, she has failed to satisfy this element of her initial claim.

To the extent Arrington asserts a Title VII claim premised on the subordinates' harassing conduct, the allegations are insufficient to demonstrate a hostile environment as a matter of law. Arrington also had full control of the office and, as just noted, refused help from her superiors when it was offered. These facts fail to support this aspect of her Title VII claim.

To the extent that Arrington asserts that Alabama Power required her to attend the funeral of the father of one of her white subordinates despite the fact that no one attended the funeral of her mother, violating company "tradition" and racially discriminating against her, the court finds the allegations completely insufficient to support her discrimination claim. (*See Id*. at 5, 7). Arrington does

not claim that she opposed going to the funeral and does not state that Alabama Power threatened her if she did not go to the funeral.

To the extent that Arrington also claims her superiors assisted others with their work while holding Arrington responsible for her work in similar circumstances, Arrington fails to show that the subordinates were similarly situated.[5]  Arrington has not identified the individuals or circumstances surrounding her conclusory allegations.  Thus, this aspect of her claim fails.

Finally, to the extent Arrington asserts that Alabama Power racially discriminated against her by refusing to employ her in positions she later applied for, giving her ratings of "Needs Improvement," refusing to recommend her for other employment opportunities, and refusing to allow her to perform activities in the community as she had done previously, the claims must fail.  (*See id*. at 4, 7, 11, 13, 14).  Arrington again fails to adequately identify the relevant positions and the successful candidates for the positions or show that limiting the community activities associated with her job was somehow an adverse employment action.

### 2.    The ADA Claims

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of a disability in regard to job application procedures; the hiring, advancement, or discharge of employees; employee compensation; job training;

---

[5]These claims also appear to be outside the limitations period for the filing of an EEOC charge.

and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a prima facie case of discrimination under the ADA, a plaintiff must

show that (1) she has a disability; (2) she is a qualified individual; and (3) she was

subjected to unlawful discrimination because of her disability. *Mazzeo v. Color*

*Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing *Holly v.*

*Clairson Industries, LLC*, 492 F.3d 1247, 1255-56 (11th Cir. 2007)). The ADA

also prohibits retaliation against an employee who has "opposed any act or practice

made unlawful by" the ADA or "made a charge, testified, assisted, or participated

in any manner in an investigation, proceeding, or hearing under" the ADA. 42

U.S.C. § 12203(a). The Eleventh Circuit "asses[es] ADA retaliation claims under

the same framework used in Title VII." *Palmer v. McDonald*, 624 F. App'x 699,

702 (11th Cir. 2015) (citing *Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117

F.3d 1278, 1287 (11th Cir. 1997)). To establish a prima facie case of ADA

retaliation, a plaintiff must demonstrate that "(1) she engaged in a statutorily

protected expression, (2) she suffered an adverse employment action, and (3) there

was a causal link between the two." *Frasier-White v. Gee*, 818 F.3d 1249, 1258

(11th Cir. 2016).

Arrington's first amended complaint does not correct the failures in her

original complaint with respect to her ADA discrimination and retaliation claims.

The facts alleged are still insufficient to state a claim for either discrimination or

retaliation. The facts show that Arrington complained of toxic mold and developed asthma from mold exposure and that Alabama Power attempted to accommodate her adverse reaction to the mold by replacing air filters, conducting duct work, and transferring her to the Pelham office and, eventually, the Birmingham corporate office.[6] (Doc. 31 at 7, 10-11). Arrington only alleges with specificity that she complained about mold exposure, not that she specifically complained about or opposed disability discrimination. (*Id*. at 7, 8, 10). Her complaint about toxic mold exposure is a complaint about an alleged workplace hazard, not a complaint about disability discrimination. Therefore, Arrington has not engaged in the "statutorily protected expression" necessary to state an ADA retaliation claim.

Arrington makes a conclusory statement near the end of her complaint stating that Alabama Power "violated [her] rights under the ADA-FMLA by removing [her] from her Supervisory role, giving unmerited low performance ratings, [giving] unmerited negative referrals for positions, demoting her, harassing comments and actions (sic) to resign via a constructive discharge." (*Id*. at 20). Arrington does not state that Alabama Power did these actions because of her asthma or other disability anywhere in her complaint. Thus, her conclusory

---

[6] According to Arrington's first amended complaint, Robinett mentioned that Arrington was moved to Pelham "because of her performance." (Doc. 31, p. 11). It is unclear from the pleading whether Arrington was moved to Pelham solely because of her adverse reaction, solely because of her performance, or both. However, none of the options support a claim under the ADA.

statement is insufficient to support her disability claims. Arrington has failed to state a claim against Alabama Power under the ADA.

**B.    "Work Place Hazard" Claim**

Arrington attempts to state a claim for "work place hazard" due to toxic mold exposure. (Doc. 31 at 18). However, there is no federal or state law claim for "work place hazard." Any claim based on an illness arising out of employment is barred by the exclusivity provisions of the Alabama Workman's Compensation Act. ALA. CODE §§ 25-5-52, 25-5-53, 25-5-113, 25-5-114. Under the Workman's Compensation Act,

> . . . no employer shall be held civilly liable for personal injury to or death of the employer's employee, for purposes of this chapter, whose injury or death is due to an accident or to an occupational disease while engaged in the service or business of the employer, the cause of which accident or occupational disease originates in the employment.

ALA. CODE § 25-5-53. Alabama Power cannot be held civilly liable in this action for Arrington's illness due to her toxic mold exposure. Arrington's remedies lie solely within the Alabama Workman's Compensation Act. Accordingly, Arrington's negligence claim is due to be dismissed.

**C.    FMLA Claims**

Arrington's amended complaint contains vague and conclusory references to the FMLA. She does not allege which FMLA rights she

believes the Defendant has violated.  She also does not allege that she was qualified to receive any FMLA benefits that were denied to her.

An employee has two distinct rights under the FMLA: "the right to take leave for the treatment of a serious health condition . . . and the right to be reinstated to the former position or an equivalent position at the end of leave." *Brown v. Montgomery Surgical Ctr.*, 2:12-cv-553-WKW, 2013 WL 1163427, at *4 (M.D. Ala. March 20, 2013) (quoting *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)).  When these rights are allegedly violated, the employee may bring two types of claims: "interference claims, in which [she] asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act; and retaliation claims, in which [she] asserts that [her] employer discriminated against [her] because [s]he engaged in an activity protected by the Act." *Pareda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012) (citing *Strickland v. Water Works and Sewer Bd. Of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)).  "To state a claim of interference, the employee must allege that [s]he was entitled to a benefit under the FMLA and was denied that benefit." *Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1247 (11th Cir. 2015) (citing *Strickland v. Water Works and Sewer Bd. Of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001)).  "To state a

claim for retaliation, an employee must allege sufficient facts to plausibly suggest that: '(1) [s]he engaged in statutorily protected activity; (2) [s]he suffered an adverse employment decision; and (3) that the decision was causally related to the protected activity.'" *Surtain*, 789 F.3d at 1247 (citing *Strickland v. Water Works and Sewer Bd. Of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001)).

Arrington does not state an FMLA interference claim because she has failed to show that Alabama Power ever denied her FMLA benefits. On the contrary, Alabama Power seems to have allowed her to take FMLA leave on multiple occasions and reinstated her to her former position or an equivalent position each time. Arrington does not suggest that any position she was granted or moved to after her leave was not equivalent; rather, Arrington complains about inconveniences such as increased travel time. (Doc. 31 at 13). However, increased travel time does not eliminate the fact that Alabama Power attempted to accommodate her requests for leave.

Arrington also fails to state an FMLA retaliation claim. Arrington asserts that Alabama Power violated her FMLA rights for the same reasons she gives for her ADA claim discussed above. (*Id*. at 20). However, the complaint does not state that these actions were taken in response to her FMLA leave. Additionally, Alabama Power did not terminate Arrington.

Premised on Arrington's allegations, it appears that Alabama Power gave Arrington equivalent positions, attempted at various times to find Arrington positions within the company, and, eventually, gave her a full year to find another position within the company or be demoted. (*Id*. at 10, 12-13, 17). While Arrington claims she was unable to find a position, that does not demonstrate that the Defendant discriminated against her. While her conclusory statement mentions being "demot[ed]," her statement of the facts does not show that she was actually demoted after her twelve months were up. (*Id*. at 20). In fact, her allegations demonstrate that she quit due to the stress she felt within her work environment.[7] (Doc. 31, p. 16). These allegations are insufficient to support her claims. Accordingly, the Court finds the complaint fails to state a claim under the FMLA.

## CONCLUSION

Premised on the foregoing, the Defendant's motion to dismiss (doc. 33) is due to be granted. Because the court previously allowed Arrington to file an amended complaint, the dismissal is due to be granted with prejudice. A separate order consistent with this opinion will be entered.

---

[7]To the extent that Arrington arguably is asserting a claim for constructive discharge, the court finds the allegations insufficient. *See Penn. State Police v. Suders*, 542 U.S. 129, 133-34 (2004) ("to establish 'constructive discharge,' the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response.").

**DATED**, this 29th day of September, 2017.

John E. Ott

_____

**JOHN E. OTT**
Chief United States Magistrate Judge